**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

EDWARD TYRONE DIXON,       )
                            )     Civil Action No. 18 – 1094
           Petitioner,     )
                            )
       v.               )     Magistrate Judge Lisa Pupo Lenihan
                            )
ROBERT MARSH, *Superintendent*,  )
PA ATTORNEY GENERAL,      )
                            )
          Respondents.   )

## MEMORANDUM OPINION[1]

Currently pending before the Court is a Petition for Writ of Habeas Corpus ("Petition") filed by Petitioner Edward Tyrone Dixon ("Petitioner") pursuant to 28 U.S.C. § 2254.[2]  (ECF No. 1.)  Petitioner challenges his judgment of sentence imposed on April 27, 2011, after he was convicted of second-degree murder, robbery, carrying a firearm without a license and criminal conspiracy at CP-02-CR-0016980-2008 in the Court of Common Pleas of Allegheny County, Pennsylvania.  For the following reasons, the Petition will be denied and a certificate of appealability will also be denied.

### A.    Procedural Background

Petitioner was charged by Criminal Information in the Court of Common Pleas of Allegheny County at CP-02-CR-0016980-2008 with one count each of criminal homicide, robbery, carrying a firearm without a license, and criminal conspiracy, in connection with the

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment.  (ECF Nos. 15 & 16.)
[2] Petitioner initiated this case in the United States District Court for the Middle District of Pennsylvania, and it was transferred to this Court pursuant to an Order dated August 15, 2018.  (ECF Nos. 5 & 6.)

death of victim Michael Ross.  (Resp't Exh. 1, ECF No. 11-1, pp.1-18; Resp't Exh. 3, ECF No. 11-1, pp.27-29.)  Petitioner proceeded to a jury trial at the conclusion of which he was found guilty of second-degree murder and all other charges.  (Resp't Exh. 3, ECF No. 11-1, pp.24-25.)  On April 27, 2011, Petitioner was sentenced to a mandatory term of life imprisonment without parole for second-degree murder, a consecutive term of ten to twenty years imprisonment for robbery, and no further penalties at the remaining counts.  (Resp't Exh. 6, ECF No. 11-1, p.38.)

Petitioner appealed his judgment of sentence, which was docketed in the Pennsylvania Superior Court at No. 851 WDA 2011.  (Resp't Exh. 6, ECF No. 11-1, pp.35-50; Resp't Exh. 7, ECF No. 11-2, pp.1-4.)  On July 23, 2013, the Superior Court affirmed in part and vacated in part the judgment of the trial court.  Specifically, the court *sua sponte* determined that the trial court imposed an illegal sentence when it imposed sentences for both second-degree murder and the underlying felony.  It thus vacated the separate judgment of sentence for robbery but affirmed the judgment of sentence in all other respects.  (Res't Exh. 14, ECF No. 11-4, pp.37-44.)  Petitioner filed a Petition for Allowance of Appeal ("PAA") in the Pennsylvania Supreme Court, which was docketed at No. 398 WAL 2013.  (Resp't Exh. 15, ECF No. 11-4, pp.45-67, ECF No. 11-5, pp.1-38; Resp't Exh. 16, ECF No. 11-5, pp.39-41.)  On January 2, 2014, the Pennsylvania Supreme Court denied the PAA.  (Resp't Exh. 18, ECF No. 11-5, p.43.)

On December 30, 2014, Petitioner, through Attorney Milton E. Raiford, filed a petition pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA").  (Resp't Exh. 19, ECF No. 11-5, pp.44-51.)  On March 6, 2015, Attorney Raiford filed a Motion for Leave to Withdraw Appearance and Withdraw Petition for Post-Conviction Relief, which the PCRA court denied on March 16, 2015.  (Resp't Exh. 20, ECF No. 11-6, pp.1-5; Resp't Exh. 21, ECF No. 11-6, p.6.)  On April 1, 2015, Attorney Raiford filed another Motion to Withdraw Petition for Post-

Conviction Relief.  (Resp't Exh. 22, ECF No. 11-6, pp.7-11.)  On June 3, 2015, the PCRA court granted Attorney Raiford permission to withdraw as counsel and appointed Attorney Suzanne Swan to represent Petitioner.  (Resp't Exh. 23, ECF No. 11-6, p.12.)

On November 18, 2015, Attorney Swan filed an Amended PCRA petition on behalf of Petitioner.  (Resp't Exh. 24, ECF No. 11-6, pp.13-28.)  On May 23, 2016, the PCRA court held an evidentiary hearing on the Amended PCRA petition, and, on July 12, 2016, the court denied PCRA relief.  (Resp't Exh. 27, ECF No. 11-6, p.55.)  An appeal to the Superior Court followed, which was docketed at No. 1136 WDA 2016.  (Resp't Exh. 28, ECF No. 11-7, pp.1-9; Resp't Exh. 29, ECF No. 11-7, pp.10-14.)  On December 8, 2017, the Superior Court affirmed the denial of PCRA relief.  (Resp't Exh. 34, ECF No. 11-9, pp.37-55.)  Petitioner, through Attorney Swan, filed a PAA with the Pennsylvania Supreme Court, which was docketed at No. 7 WAL 2018.  (Resp't Exh. 35, ECF No. 11-10, pp.1-49; ECF No. 11-11, pp.1-35; Resp't Exh, 36, ECF No. 11-11, pp.36-38.)  The PAA was denied on July 2, 2018.  (Resp't Exh. 38, ECF No. 11-11, p.40.)

Petitioner initiated the instant habeas proceedings on or about July 29, 2018.  (ECF No. 1.)  The Respondents filed their Answer to the Petition on October 2, 2018.  (ECF No. 11.)

## B.    Factual Background

The trial court set forth the following summary of the facts underlying Petitioner's convictions:

> On November 8, 2008, Michael Ross was the owner and operator of a business known as CC&M Fashions located on Hodgki[s]s Street in the Northside Section of the City of Pittsburgh.  Ross sold t-shirts and other sports-related wearing apparel from the store; however, because his father and grandfather who had previously operated the store were robbed or attempted to be robbed on several occasions, Ross rarely kept more than sixty dollars on the premises and he also had a thirty-eight-caliber revolver in his desk drawer.  Ross opened his store

3

sometime between 11:30 a.m. and 12:00 p.m. and shortly thereafter, Ross'[s] father came to the store and assisted him and was working in the back of the store, storing additional items that Ross had for sale.

Earlier on November 8, 2008, Ross had attempted to call his girlfriend, Christine Johnson.  They had made numerous phone calls to each other; however, they had not been able to reach each other.  At approximately 1:00 p.m., Ross and Johnson were finally able to reach each other on the telephone and were talking for several moments when she heard someone come into the store.  Apparently[,] Ross believed that he had disconnected the phone connection but he had not and Johnson was able to hear what was going on in the store.  Johnson heard Ross say to someone who had come into the store, "Take your hoodie off" and also heard the individual who came into the store say, "Give me your money[."]  She then disconnected this conversation and called 911 to report a robbery that was taking place at Ross'[s] business.

Fred Ross, who was working in the back of the store, knew that his son was on the phone and decided to deal with the inventory in the storage area.  While he was working in the back of the store, he heard Michael Ross yell to him, "Dad, it's on[."]  Fred Ross then came to the front of the store and partially obscured by several racks of clothing saw two young, black males come into the store, both of whom were dressed in black and had what appeared to be black masks on.  Both of the men that Fred Ross saw were armed and one of the two was yelling at Michael Ross to "Give up the money[."]  The two intruders were focused on Michael Ross and not Fred Ross and he was able to run out the front door and across the street to Kuhn's Market where he had hoped to find a Pittsburgh Police Officer or security guard to assist him in the prevention of this robbery.  Once he was outside of the store he heard several gunshots and turned to see the two intruders leaving the store and heading down Ingram Street.  Fred Ross went into the store and saw Michael Ross lying on the floor and realized that there was nothing he could do for him.

Victoria Zuback, (hereinafter referred to as "Zuback"), was walking her dog along Ingram Street when she heard a series of gun shots.  Shortly after hearing those gunshots, she heard the sound of footsteps approaching her and when she turned to look, she saw two individuals dressed in black, with black masks on.  The first individual went to a large SUV that was parked in front of a house and [she] saw that individual go to the rear of the vehicle, open the left rear door and appear to put something in the back, close the door and then get into the driver's seat.  Shortly thereafter she heard another individual heading toward the SUV and saw that individual get into the front passenger seat and then saw the vehicle leave the scene.

Jamal El-[Amin], (hereinafter referred to as "El-[Amin]"), was in his bedroom on the second floor of his home in Ingram Street and was about to

4

change his clothes so he could go out and rake the leaves.  When he was looking out his bedroom window, he noticed a large SUV parked in front of his house, which was parked in the wrong direction.  El-[Amin] went to his son's bedroom to get a better look at the vehicle and in looking out his son's bedroom window, he saw an individual all dressed in black reach the SUV, go to the back rear, open up the rear door and attempt to dispose of something.  He then saw that individual get into the driver's seat.  He also saw that there was someone else in the passenger seat and although he did not have a full view of them he was able to determine that there was someone there because he saw his legs.  El-[Amin] went down the stairs but by the time he got down the stairs, the SUV was gone.  When he observed the driver of the SUV, he noticed that his hair was messed up[,] like it had been braided and combed out and processed to relax it.  El-[Amin] then went out to rake his leaves and while he was doing this chore, he was approached by homicide detectives who were investigating the shooting at CC&M [Fashions] and [El-Amin] told them what he had seen.  When the homicide detectives asked him whether he could identify the van and the driver if he saw them again, he told them yes.

The killing of Michael Ross occurred approximately one mile from the Allegheny General Hospital in the Northside Section of Pittsburgh at approximately 1:15 p.m.  At approximately 1:30 p.m., Pittsburgh homicide detectives received a phone call from the Mercy Hospital emergency room stating that they had a shooting victim in their emergency room that was being treated.  Detectives were dispatched to Mercy Hospital to investigate that shooting and determined that individual who had been shot was Darnell and that he was currently in surgery for his gunshot wound.  These homicide detectives also saw [Petitioner] in the emergency room.  These detectives also noted a Chevrolet Yukon SUV with the driver's side and passenger side doors open and noticed that there was blood on the passenger seat area of that Yukon.  They asked [Petitioner] if he was the owner of the vehicle and he said that he was[,] and they received consent from him to search that vehicle.  In the rear of the vehicle, they found two black t-shirts tied up in a manner so as to permit them to be used as masks and they also found several shite sports t-shirts.  During the course of the inspection of the vehicle, it was noticed that the interior panel in the rear on the driver's side was loose and when that was removed a twenty-two caliber semi-automatic handgun was found.

Homicide detectives at the CC&M [Fashions] shooting and at Mercy Hospital were continuing to provide each other with information on what they believed to be two different shootings when it was suggested that El-[Amin] be brought to Mercy Hospital to see if he might be able to identify the SUV and driver.  El-[Amin] was driven to Mercy Hospital and when he saw [Petitioner], he immediately identified him as the driver of the SUV that was parked in the emergency area of Mercy Hospital.  Detective Robert Provident of the Pittsburgh Homicide Unit initially interviewed [Petitioner] at the emergency room at Mercy

Hospital and [Petitioner] told him that his uncle had been shot in Swissvale and that he drove him to the nearest hospital that he knew.  At the time that Detective Provident interviewed [Petitioner], he did not know that [Petitioner] had been identified by El-[Amin] as the driver of the SUV seen in connection with the CC&M [Fashions] shooting.  Detective Provident transported [Petitioner] to the Homicide Division Headquarters so that he could be interviewed as a material witness.  At the Homicide Headquarters, Detective Provident obtained biographical information about [Petitioner] and also obtained written consent forms to search his car and his house and [Petitioner] was given his Miranda warnings, both verbally and in writing and signed the Miranda rights form.

In his initial version of what transpired, [Petitioner] maintained that he was at home with his girlfriend when he received a phone call from his uncle asking for him to pick him up near McKeesport.  [Petitioner] was traveling [on] the Parkway East when he exited on the Edgewood Exit and as he approached Braddock Avenue, saw his uncle[, Darnell,] crouched down on the side of the road.  He stopped his vehicle and his uncle got in and told him that he had been shot and then he turned around and headed toward Mercy Hospital.  After a break, Detective Provident continued his interview and [Petitioner] said he was at Darnell's home in the Woods Run Section of the City of Pittsburgh, which is located on the Northside area of Pittsburgh.  Eventually[,] he gave his uncle a ride to a Shell gas station located at Hodgki[s]s Street and Ingram when he received a phone call from his uncle to pick him up at the gas station and that his uncle was shot and to take him to the hospital.

Detective Provident took another break and then resumed his interview with [Petitioner] but this time, prior to asking [Petitioner] any questions, he advised him that there were potential witnesses who would identify him as being associated with the shooting that occurred at the CC&M Fashion[s] store.  [Petitioner] then told Detective Provident of his involvement in the shooting at CC&M Fashions.  He stated that he had parked the SUV approximately one block from the store and before he got out of the vehicle, Darnell told him to put a black t-shirt on as a mask to cover up his face.  Darnell went into the store first and had two guns and was pointing them at the clerk when [Petitioner] came into the store.  Darnell then told him to get the clerk from behind the counter and to get some shirts.  He then took one of the two revolvers from his uncle and ordered the clerk from behind the counter.  While he was making these demands, Darnell was demanding that Michael Ross give him the money.  While [Darnell] held a gun on Michael Ross[, Petitioner] heard Fred Ross in the back room and then saw him run past both of them and out the door.  Michael Ross came from behind the counter and a physical encounter then began between Michael Ross and Darnell, with both of these individuals firing their weapons at each other.  [Petitioner] fired three shots into the floor in an attempt to scare Michael Ross and then ran out of the store.  As he ran out of the store, he then handed his gun off to his uncle.  When he was running down the street toward the SUV, he heard at least three or

four more shots. As he got to the SUV his uncle joined him and they threw the shirts that his uncle had taken from the store, along with a gun in the back of the truck. [Petitioner] got into the driver's seat and Darnell got into the passenger seat and told [Petitioner] that he had been shot and [asked that Petitioner] take him to a hospital[,] but not to a hospital on the Northside. As they were driving down Marshall Avenue, Darnell lowered the passenger window and threw out a handgun. [Petitioner] then drove from the Northside to Mercy Hospital located in the Uptown Section of the City of Pittsburgh. As they concluded their interview with him, Detective Provident asked [Petitioner] if he would give a taped statement and he agreed to do so.

On November 11, 2008, Detective James Magee went to Mercy Hospital, seeking to interview Darnell. Detective Magee was directed to Darnell's attending physician and asked him whether or not Darnell was in any condition to be interviewed and was informed that he could be interviewed. Detective Magee then met Darnell in his hospital room and then told him the reason that he was there to interview him was about the circumstances of which he was shot on November 8, 2008. Darnell told him that he had met with two detectives the day before and they advised him that he was probably going to be charged with criminal homicide. Detective Magee told him that he was probably correct and then advised him of his Miranda rights. Darnell told Detective Magee that although he recalled going to CC&M Fashions, he did not recall where they parked the car. He remembered going into the store and then Michael Ross came from behind the counter with a gun in his hand and then he heard [a lot] of people yelling at which time he ran out of the store back to the area where they had left the car. While running to the SUV, he had difficultly breathing and he realized he had been shot and [he] told [Petitioner] to drive him to a hospital. After ten or fifteen minutes it became apparent that Darnell was experiencing some pain and the interview ceased. Darnell was discharged later that day from the hospital.

During the ongoing investigation in the CC&M Fashion[s] shooting a thirty-two-caliber handgun was recovered from Marshall Avenue at the Route 65 Interchange. A review of the gun ownership records indicated that Fred Ross owned that firearm.

(Resp't Exh. 11, ECF No. 11-2, pp.22-29.)

C.    **Standard of Review**

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a

federal habeas court may overturn a state court's resolution of the merits of a constitutional issue

only if the state court decision was "contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States."  28

U.S.C. § 2254(d)(1).  The phrase "clearly established Federal law," as the term is used in section

2254(d)(1) is restricted "to the holdings, as opposed to the dicta of [the United States Supreme

Court] decisions as of the time of the relevant state-court decision."  Williams v. Taylor, 529

U.S. 362, 365 (2000).

      The Supreme Court has identified two scenarios where a state court decision will fall into

section 2254(d)(1)'s "contrary to" clause.  First, a state court decision will be "contrary to"

clearly established federal law when the court "applies a rule that contradicts the governing law

set forth in [Supreme Court] cases."  Williams, 529 U.S. at 405.  It set forth the following

example where a state court decision would be "contrary to" Strickland v. Washington, 466 U.S.

668 (1984), the familiar clearly established federal law governing ineffective assistance of

counsel claims.

> If a state court were to reject a prisoner's claim of ineffective assistance of
> counsel on the grounds that the prisoner had not established by a preponderance
> of the evidence that the result of his criminal proceeding would have been
> different, that decision would be 'diametrically different,' 'opposite in character
> or nature,' and 'mutually opposed' to our clearly established precedent because
> we held in Strickland that the prisoner need only demonstrate a 'reasonable
> probability that . . . the result of the proceeding would have been different.'

Williams, 529 U.S. at 405-06 (internal citations omitted).  The Supreme Court said that a state

court decision will also be "contrary to" clearly established federal law if it "confronts a set of

facts that are materially indistinguishable from a decision of this Court and nevertheless arrives

at a result different from our precedent."  Id. at 406.

      The Supreme Court has said that under the "unreasonable application" clause of 28

U.S.C. § 2254(d)(1), a state court decision involves an unreasonable application of Supreme

Court precedent "if the state court identifies the correct governing legal rule from [the Supreme]

Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407.  Under this standard, "a federal habeas court may not grant relief simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  The Supreme Court later expanded on this interpretation of the "unreasonable application" clause explaining that the state court's decision must be "objectively unreasonable," not merely wrong; even "clear error" will not suffice. Locklyer v. Andrade, 538 U.S. 63, 75 (2003).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

If a petitioner is able to satisfy the requirements of § 2254(d)(1), then the state court decision is not entitled to deference under AEDPA and the federal habeas court proceeds to a *de novo* evaluation of the constitutional claim on the merits.  *See* Tucker v. Superintendent Graterford SCI, 677 F. App'x 768, 776 (3d Cir. 2017) (citing Panetti v. Quarterman, 551 U.S. 930, 953 (2007) ("When . . . the requirement set forth in § 2254(d)(1) is satisfied[,] [a] federal court must then resolve the claim without the deference AEDPA otherwise requires.").  Indeed, the Third Circuit recently explained that,

> [w]hile a determination that a state court's analysis is contrary to or an unreasonable application of clearly established federal law is necessary to grant habeas relief, it is not alone sufficient.  That is because, despite applying an improper analysis, the state court still may have reached the correct result, and a federal court can only grant the Great Writ if it is "firmly convinced that a federal constitutional right has been violated," Williams, 529 U.S. at 389, 120 S.Ct. 1495. *See also* Horn v. Banks, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301

9

(2002) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review . . . none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard").  Thus, when a federal court reviewing a habeas petition concludes that the state court analyzed the petitioner's claim in a manner that contravenes clearly established federal law, it then must proceed to review the merits of the claim *de novo* to evaluate if a constitutional violation occurred.  *See* Lafler v. Cooper, 566 U.S. 156, 174, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012).

Vickers v. Superintendent Graterford SCI, 858 F.3d 841, 848-89 (3d Cir. 2017) (internal footnote omitted).

The AEDPA further provides for relief if an adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Under § 2254(d)(2), a state court decision is based on an "unreasonable determination of the facts" if the state court's factual findings are "objectively unreasonable in light of the evidence presented in the state-court proceeding," which requires review of whether there was sufficient evidence to support the state court's factual findings.  *See* Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Within this overarching standard, a petitioner may attack specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision.  Here, § 2254(e)(1) comes into play, instructing that the state court's determination must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence.  Lambert v. Blackwell, 387 F.3d 210, 235 (3d Cir. 2004).  Importantly, the evidence against which a federal court measures the reasonableness of the state court's factual findings under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.  Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

10

D.      **Discussion**

Petitioner raises three grounds for relief in his Petition.  First, he claims that his trial

counsel was ineffective for failing to "plead, present and preserve" challenges to his confession

and consent to search his vehicle.  Second, he claims that his confession and consent to search

his vehicle were coerced through police misconduct.  Third, he claims that he is actually

innocent of the crimes of which he was convicted.  The claims will be addressed in a different

order for ease of explanation.

1.      **Voluntariness of Confession**

Petitioner argues that his confession and consent to search his vehicle were coerced

through police misconduct.  Petitioner raised a similar claim on direct appeal arguing that the

trial court erred in failing to grant his suppression motion with respect to the various statements,

including a confession, that he had made to the police.[3]  In its Pennsylvania Rule of Appellate

Procedure 1925(a) Opinion, the trial court made the following findings of fact and conclusions of

law with respect to this claim.

> . . . . A suppression hearing was held on the motion filed by [Petitioner] to
> suppress his statements to the police and his identification by an essential
> eyewitness to the shooting that occurred on Hodgki[s]s Street at CC&M Fashions.
> Testifying at the suppression hearing were Detectives Provident and Statler and
> El-[Amin].  The current claim of error of [Petitioner] is only asserting that this
> Court erred when it denied suppressing his statements to the police and not the
> identification by El-[Amin].  The testimony offered by Detective Statler and El-
> [Amin] goes to El-[Amin]'s identification.  The only testimony presented with
> respect to the statements made to the police was the testimony of Detective
> Provident.
>
> Detective Provident testified that Pittsburgh Homicide received a call that
> an individual had been shot and taken to Mercy Hospital.  In addition, he further

---

[3] Although his omnibus pretrial motion did encompass a request to suppress physical evidence that was seized as a result of the search of his vehicle, Petitioner did not challenge on direct appeal the trial court's denial of that portion of his motion or the voluntariness of his consent to search his vehicle, and, to the extent he does so here, that part of Petitioner's claim is unexhausted and procedurally defaulted.

testified that other homicide detectives were sent to Hodgki[s]s Street with respect to a shooting that occurred in that area.  Detective Provident went to Mercy Hospital to ascertain that the victim of the shooting was Darnell [Dixon] and that [Petitioner] was the driver of the SUV that had transported Darnell to the hospital. The front passenger door was open and Detective Provident could see blood on the passenger seat and vomit on the floor.  [Petitioner] identified himself as the owner of the vehicle and the individual who had driven Darnell to the hospital. When he was asked whether or not the police could search his vehicle he gave them a verbal consent to do so.  Although Detective Provident had this verbal authorization to search the vehicle he did not do so but rather had the vehicle towed and then received a written consent form from [Petitioner].

During the course of his initial investigation, Detective Provident was updated on the shooting that had occurred on the Northside and received information that there were two black males who had fled the scene in a tan SUV. Detective Provident took [Petitioner] back to Homicide Headquarters and after securing the consent form to search his car, he advised [Petitioner] of his Miranda rights since he was a possible suspect in the shooting that occurred in the Northside.  [Petitioner] answered all of the questions of the Miranda form and signed that form.  In addition he agreed to have a buccal swab taken from him for DNA investigation purposes.  Initially [Petitioner] gave Detective Provident a statement that his uncle had been shot in another section of town and that his uncle called him to take him to the hospital.  When [Petitioner] was confronted with the fact that he was a possible suspect in the shooting death of Michael Ross, he gave Detective Provident a statement of his involvement of that shooting and then had that statement taped.  At no time did [Petitioner] appear to be under the influence of alcohol or a controlled substance nor did he appear to be unable to understand the questions that were being asked of him.

During the cross-examination of Detective Provident, [Petitioner]'s trial counsel sought to establish that [Petitioner] was under the influence of alcohol. Detective Provident acknowledged that [Petitioner] had told him that he had been drinking all night; however, Detective Provident did not notice any visible signs of intoxication.  He did not detect any odor of an alcoholic beverage nor did [Petitioner] slur his words or was unable to understand what was transpiring.  It should be noted that his questioning by Detective Provident did not begin until after 3:00 p.m. on November 8, 2008.  Based upon a review of the facts that were established at the time of the suppression hearing, it is clear that any statements made to the police by [Petitioner] were freely and voluntarily made and that he was fully advised of his Miranda rights prior to giving any inculpatory statements to the police.

(Resp't Exh. 11, ECF No. 11-2, pp.41-43.)  In his brief on appeal, Petitioner argued that "the trial court should have considered that he was small compared to the interrogating officers, was not a

12

high school graduate, had an unskilled job, and was without a lawyer, family or friends during the interrogation." (Resp't Exh. 14, ECF No. 11-4, p.38) (citing Brief for Appellant at 20-21, 32.) He further argued that he "did not voluntarily provide the statements because he was isolated from the outside world during the interrogation; he was interrogated for multiple hours in a windowless room; he indicated that he had no meaningful information at the outset of the interrogation; he insisted that he was innocent of any wrongdoing; and the officers used deceit and trickery during the interrogation." Id., pp.38-39 (citing Brief for Appellant at 18-19, 32-33.) With respect to reviewing the voluntariness of a confession, the Superior Court noted that a court

> looks at the totality of the circumstances to determine whether, because of police conduct, the defendant's "will has been overborne and his capacity for self-determination critically impaired." [Commonwealth v. Roberts, 969 A.2d 594,] 598-99 [(Pa. Super. 2009)] (citation omitted). "When reviewing voluntariness pursuant to the totality of the circumstances, this Court considers the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand coercion." Id. at 599.

(Resp't Exh. 14, ECF No. 11-4, pp.39-40.) In examining the totality of the circumstances surrounding Petitioner's statements to the police, the Superior Court found that

> [Petitioner], who was almost 20 years old at the time of the interview, was given his *Miranda* [FN] warnings and [Petitioner] initialed and signed the pre-interrogation waiver form indicating that he understood his rights and wished to speak to the detectives. N.T., 1/21/10, at 7-9, 14, 42, 48; *see also id*. at 9 (wherein Detective Robert Provident, the interviewing detective, stated that [Petitioner] did not appear to have any difficulty in understanding his rights). During the interview, Detective Provident told [Petitioner] that he could stop the interview at any time. *Id*. at 14. Further, [Petitioner], who was not handcuffed, was given bathroom breaks and offered food and drinks. *Id*. at 15, 27. Finally, the duration of the interview was approximately four hours. *Id*. at 15, 42, 47. Based upon the totality of the circumstances, we conclude that [Petitioner] voluntarily provided the statements to the police and adopt the sound reasoning of the trial court for the purpose of this appeal. *See* Trial Court Opinion, 5/8/12, at 23-25; *see also Commonwealth v. Perez*, 845 A.2d 779, 789 (Pa. 2004) (concluding that appellant voluntarily gave statements to the police where he was read his *Miranda* rights

13

and indicated that he understood and waived the rights; he was given breaks
during the interview; his demeanor did not change throughout the interview; and
the interview process took approximately four hours).

_____

      FN    <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

(Resp't Exh. 14, ECF No. 11-4, pp.40-41.)

      The clearly established federal law at issue here stems from <u>Miranda</u>, where the Supreme

Court held that a criminal defendant may only waive his Fifth Amendment right to have an

attorney present during custodial interrogation if "the waiver is made voluntarily, knowingly and

intelligently." 384 U.S. at 444. The Supreme Court has stated that a valid <u>Miranda</u> waiver has

two dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it
> was the product of a free and deliberate choice rather than intimidation, coercion,
> or deception. Second, the waiver must have been made with a full awareness of
> both the nature of the right being abandoned and the consequences of the decision
> to abandon it. Only if the "totality of the circumstances surrounding the
> interrogation" reveal both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the *Miranda* rights have been
> waived.

<u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (citing <u>Fare v. Michael C.</u>, 442 U.S. 707, 725

(1979)). "The ultimate question in the voluntariness calculus is 'whether, under the totality of

the circumstances, the challenged confession was obtained in a manner compatible with the

requirements of the Constitution.'" <u>Fahy v. Horn</u>, 516 F.3d 169, 194 (3d Cir. 2008) (quoting

<u>Miller v. Fenton</u>, 474 U.S. 104, 112 (1985)). These surrounding circumstances can include "not

only the crucial element of police coercion, but may also include the length of the interrogation,

its location, its continuity, [and] the defendant's maturity, education, physical condition, and

mental health." <u>Lam v. Kelchner</u>, 304 F.3d 256, 264 (3d Cir. 2002) (internal citations and

quotations omitted).

Because this claim was adjudicated on the merits in state court, it is entitled to deference under AEDPA, and, in order for Petitioner to overcome that deference, he must establish that the state court's determination was "contrary to" clearly established federal law or reflected "an unreasonable application" of that law.  28 U.S.C. § 2254(d)(1).

Upon review, the Court finds that there is no basis to disturb the state court's decision to deny relief on this claim under AEDPA's deferential standards of review.  In evaluating this claim, the Superior Court cited to the appropriate United States Supreme Court precedent, *i.e.*, Miranda, and articulated and applied the proper "totality of the circumstances" test to the events surrounding Petitioner's interrogation and confession to determine if his decision to waive his Miranda rights was knowing, intelligent and voluntary.  As such, the state courts' decision in this case complies with the United States Supreme Court's mandate that courts consider the "totality of the circumstances" surrounding an interrogation when determining whether a defendant properly waived his Miranda rights, and, consequently, was not "contrary to" clearly established federal law.  The state courts' application of the voluntariness standard to the facts of this particular case was also reasonable and was thus not an "unreasonable application" of clearly established federal law.  The state courts' analysis was thorough and attentive to the relevant evidence and the factors bearing on voluntariness.

To the extent that Petitioner argues that the state courts erred as a matter of fact in finding that the totality of the circumstances did not cause his statements to police to be rendered involuntary, Petitioner fails to rebut the factual determinations made by the trial court, and adopted by the Superior Court, by pointing to any evidence, much less clear and convincing evidence, to show that the state court's determination of the facts was unreasonable in light of the record before it.  Accordingly, this claim will be denied.

15

## 2. **Ineffective Assistance of Counsel**

Petitioner argues that his trial counsel was ineffective for failing to "plead, present and preserve" challenges to his confession and consent to search his vehicle.  Petitioner raised similar versions of this claim in his PCRA petition asserting that (1) his trial counsel was ineffective for failing to argue that he was illegally arrested prior to his providing police with consent to search his vehicle, and his confession to the robbery and murder of Michael Ross, and (2) even if his arrest was lawful, his consent to search his vehicle was involuntary and, thus, his trial counsel should have sought suppression of the fruits of that illegal search.  Affirming the denial of PCRA relief after concluding that counsel was not ineffective, the Superior Court analyzed these two claims as follows:

> [Petitioner] contends that his trial counsel was ineffective for failing to argue that he was illegally arrested prior to providing police with consent to search his vehicle, and his confession to the robbery and murder of Michael Ross. [Petitioner] avers that "the police conduct constituted an arrest . . . as soon as he was placed in the police vehicle [at Mercy Hospital] and brought to the homicide office[,] where he was shackled to the floor in an interrogation room." Appellant's Brief at 23.  [Petitioner] provides a detailed discussion of the facts which, according to him, demonstrate that he was arrested.  *See id.* at 22-26.  For instance, he stresses that, while he was at the hospital, he was handcuffed and flanked by uniformed officers at various times, including during Mr. El-Amin's identification of him.  [Petitioner] also emphasizes that he was handcuffed and placed in the back of a police cruiser to be transported from the hospital to the police department and, once there, he was ostensibly "shackled" to the floor in a small, windowless interrogation room.  Based on these circumstances, [Petitioner] maintains that the police effectively arrested him without probable cause to do so.

> Even if we accept [Petitioner]'s position that he was effectively arrested at the point at which he was transported from the hospital to the police station, [Petitioner] has not demonstrated that there was no probable cause to support that warrantless arrest.  In regard to the lack of probable cause to justify his arrest, [Petitioner]'s argument consists of one sentence:  "At that point[, *i.e.*, when he was placed in the police vehicle, brought to the police station, and shacked to the floor,] the only information the police had was that Mr. El-[Amin had] identified the SUV, and [Petitioner] as the driver of the SUV, [that Mr. El-Amin had] seen [the SUV] parked in front of his house, shortly before the police arrived in the

16

area to investigate a shooting; and Detective Provident had observed blood and vomit on the front passenger seat of the SUV." *Id*. at 23.

[Petitioner]'s cursory argument does not convince us that probable cause was lacking at the point at which he was arrested.

* * * *

Here, the record demonstrates that the totality of the circumstances known to the officers prior to [Petitioner]'s being handcuffed and placed in the back of the police cruiser – at which point he claims he was arrested – were sufficient to demonstrate probable cause to conduct an alleged arrest.  Clearly, prior to [Petitioner]'s purported arrest, police knew that an armed robbery and homicide had occurred at CC&M Fashions.  They knew that the suspects were two black males, that guns had been fired during the course of the robbery, and that the two robbers had fled the scene. *See* N.T. Trial Vol. I, 1/24-31/11, at 63, 84-86, 93-94. Additionally, Mr. El-Amin had told officers that, shortly before they arrived at the scene of the robbery, an SUV had been parked outside of his home, which was near the CC&M Fashions.  Mr. El-Amin described the vehicle and the man that he had seen entering the driver's seat of the SUV, which had also contained a passenger.  A short time after the robbery, police officers at the scene received word from officers at Mercy Hospital that [Petitioner] had arrived there in an SUV with his uncle, who had been shot.  [Petitioner] and his uncle are both African American men, and the vehicle they had arrived in was similar to the one described by Mr. El-Amin.  Accordingly, police brought Mr. El-Amin to the hospital, where he identified the vehicle, and [Petitioner], as the same vehicle and man who were outside his home close, in time and proximity, to the robbery and murder that had occurred.

We conclude that the totality of these facts provided officers with probable cause that [Petitioner] committed the crimes at CC&M Fashions.  Therefore, even if [Petitioner] was effectively arrested at the point at which he was transported from the hospital to the police station, he has failed to demonstrate that that arrest was unlawful.  Consequently, his trial counsel was not ineffective for failing to challenge the legality of his alleged arrest.

In [Petitioner]'s second IAC claim, he avers that, even if his arrest was lawful, his consent to search his vehicle was involuntary and, thus, his trial counsel should have sought suppression of the fruits of that illegal search. [Petitioner] claims that his consent to search his SUV "was clearly the result of coercive actions and a coercive atmosphere created by the police."  Appellant's Brief at 30.  In support, [Petitioner] stresses the following facts:

When [Petitioner] arrived at police headquarters, he was searched and then immediately placed in a windowless, 12' [by] 10'

17

interrogation room consisting of only a table and three chairs.  At
approximately 3:00 p.m., Detectives Provident and Lutton issued
*Miranda* warnings, had him sign the first consent to search form,
and began to interrogate [Petitioner] about his uncle's shooting.

Detective Provident was 6'4" in height, and weighed
roughly [2]25 pounds, and Detective Lutton also weight over 200
pounds.  On the other hand, [Petitioner] was only 19 years old, and
weighed no more than 150 pounds.  [Petitioner] was not a high
school graduate, and he had a menial, unskilled job delivering
boxes.  Furthermore, throughout the interrogation process,
including when he signed the form to search his truck, [Petitioner]
was without a lawyer, family, or friends to provide support and
guidance.  In fact, he was highly distraught over the fact that his
uncle had been shot.

More than four hours after [Petitioner] had been placed in
the interrogation room, Officer Thomas Leheny and his partner,
Detective Hitchings, got [Petitioner] to sign a second consent form
to search the vehicle that he used to drive his uncle to the hospital.
Both of the officers went into the interview room to give
[Petitioner] the form.  Officer Leheny testified that it was standard
procedure that a person in the interrogation room be shackled to
the floor.  According to the officer, [Petitioner's] clothing had been
removed prior to his being asked for consent to search his vehicle.
Officer Leheny estimated that he was in the room with [Petitioner]
from 8:10 p.m. to 8:25 p.m. or 8:30 p.m., a total of about 20
minutes.

*Id*. at 32-33.

From these facts, [Petitioner] contends that "there is no question that [he]
merely acquiesced in police directives at this time.  His free will overborn, he
signed the consent forms.  Under the totality of these circumstances, [Petitioner's]
consent was not voluntary."  *Id*. at 34.  [Petitioner] maintains that his trial counsel
was ineffective for failing to seek suppression of the evidence recovered from the
SUV, based on an assertion that his consent to search that vehicle was coerced.

[Petitioner's] argument is unconvincing.  Notably, trial counsel *did*
challenge the voluntariness of the confession that [Petitioner] provided to police
just a short time after he gave them his consent to search the SUV.  After the
suppression court rejected that claim, counsel filed an appeal with this Court,
presenting very similar arguments as that raised by [Petitioner] herein.  Namely,
counsel argued that [Petitioner's] confession was involuntary . . . [and we]
reject[ed] [Petitioner's] claim that his confession was coerced . . . .

18

* * * *

[Petitioner] does not discuss our decision in [his direct appeal], or explain why we should deem involuntary his consent to search his vehicle, despite that the [direct appeal] panel concluded that his confession – given under the *same* circumstances as his consent to search – was voluntary.  We recognize that assessing the voluntariness of a consent to search involves slightly different factors than a review of the voluntariness of a confession.  *See Commonwealth v. Kemp*, 961 A.2d 1247, 1261 (Pa. Super. 2008) (concluding that the following factors "are pertinent to a determination of whether consent to search is voluntarily given: 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including its degree of coerciveness; 8) whether the person has been told that he is free to leave; and 9) whether the citizen has been informed that he is not required to consent to the search").  However, [Petitioner] does not specifically discuss how an assessment of these factors demonstrates that his consent was involuntary.  Instead, he cites the same facts address in [his direct appeal] to argue that the totality of the circumstances were coercive and rendered his consent involuntary.  Given [this Court]'s rejection of that same argument pertaining to the voluntariness of [Petitioner]'s confession, and [Petitioner]'s failure to distinguish [this Court]'s holding [in his direct appeal] from his present argument, we conclude that he has not established that his consent to search his vehicle was involuntarily given.  [FN]  Thus, [Petitioner]'s trial counsel was not ineffective for failing to raise such a claim prior to trial.

─────────────────────────────

[FN]   This is especially true where the record demonstrates that [Petitioner] was well aware of his rights regarding the search.  Specifically, [Petitioner] completed two consent to search forms, one with Detective Provident shortly after his interview commenced, and the other several hours later with Detective Leheny.  *See* N.T. Suppression Hearing, 1/21/10, at 11; N.T. Trial Vol. I at 487.  Detective Provident testified at the suppression hearing that, at the start of [Petitioner]'s interview (and prior to his confession), the detective explained [Petitioner]'s rights to him regarding the search of the vehicle; specifically, the detective "read the rights off the consent to search form.  And then [Petitioner] did the same, he stated he understood his rights and he signed it."  N.T. Suppression Hearing at 12.  [Petitioner] also specifically indicated that his consent was "given voluntarily without any threats or promises of any kind being made to [him]."  *Id*. at 13.  Later that day, at approximately 8:20 p.m., Detective Leheny completed a second consent to search form with [Petitioner].  N.T. Trial Vol. I at 486-87, 489.  The detective again read the form to [Petitioner], after which

[Petitioner] indicated that he understood the rights outlined in the form, and that he consented to the search of his vehicle. *Id*. at 487.

(Resp't Exh. 34, ECF No. 11-9, pp.46-54.)

Because this claim was adjudicated on the merits in state court, it is entitled to deference under AEDPA, and, in order for Petitioner to overcome that deference, he must establish that the state court's determination was "contrary to" clearly established federal law or reflected "an unreasonable application" of that law. 28 U.S.C. § 2254(d)(1). Like Petitioner's previous claim, though, there is no basis to disturb the state court's decision to deny these two ineffective assistance of counsel claims since Petitioner has not met his burden under AEDPA's deferential standard of review.

The "clearly established federal law" governing ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the United States Supreme Court recognized that a defendant's Sixth Amendment right to the assistance of counsel for his defense entails the right to be represented by an attorney who meets a minimal standard of competence. 466 U.S. at 685-87. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance[.]" Burt v. Titlow, 571 U.S. 12, 24 (2013). Under Strickland, it is a petitioner's burden to establish that his "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Id. at 687. The Supreme Court has emphasized that "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[.]'" Titlow, 571 U.S. at 22 (quoting Strickland, 466 U.S. at 690); Richter, 562 U.S. at 104 ("A court considering a claim

20

of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (quoting <u>Strickland</u>, 466 U.S. at 689). <u>Strickland</u> also requires that a petitioner demonstrate that he was prejudiced by his trial counsel's deficient performance. This places the burden on him to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.

Here, the Superior Court analyzed Petitioner's ineffective assistance of counsel claims under the test for ineffective assistance of counsel claims in Pennsylvania, which requires a petitioner plead and prove: "(1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result." [4] (Resp't Exh. 34, ECF No. 11-9, p.45) (citing <u>Commonwealth v. Ali</u>, 10 A.3d 282, 291 (Pa. 2010)). The Third Circuit has held that this three-prong standard utilized by Pennsylvania courts is not "contrary to" <u>Strickland</u>, the standard enunciated by the United States Supreme Court in judging ineffectiveness claims, *see* <u>Wertz v. Vaughn</u>, 228 F.3d 178, 204 (3d Cir. 2000), and given that the state court applied a standard that does not contradict <u>Strickland</u>, and the fact that the Court is unaware of a case with materially indistinguishable facts where the Supreme Court arrived at the opposite result, the Superior Court's adjudication of this claim satisfies review under the "contrary to" clause of § 2254(d)(1). *See* <u>Williams</u>, 529 U.S. at 406 (a "run-of-the-mill" state-court decision applying the correct legal rule from Supreme Court decisions to the

---

[4] Pennsylvania law for judging ineffectiveness corresponds with the <u>Strickland</u> standard. <u>Commonwealth v. Pierce</u>, 527 A.2d 973, 976-77 (Pa. 1987); <u>Commonwealth v. Kimball</u>, 724 A.2d 326 (Pa. 1999). Although Pennsylvania courts typically articulate a three-prong test for gauging ineffective assistance claims and <u>Strickland</u> sets forth its test in two prongs, the legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts.

facts of a particular case does not fit within § 2254(d)(1)'s "contrary to" clause and should be reviewed under the "unreasonable application" clause).  The inquiry now becomes whether its decision was an objectively unreasonable application of that law.

Under the "unreasonable application" provision of § 2254(d)(1), the appropriate inquiry is whether the state courts' application of Strickland to a petitioner's ineffectiveness claim was objectively unreasonable, *i.e.*, the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under Strickland.  To satisfy his burden under § 2254(d)(1), a petitioner must do more than convince this Court that the Superior Court's decision denying a claim was incorrect.  Dennis v. Secretary, Pennsylvania Department of Corrections, 834 F.3d 263, 281 (3d Cir. 2016).  He must show that it "'was *objectively* unreasonable.'"  Id. (quoting Williams, 529 U.S. at 409).  In addressing Strickland's ineffective assistance standard and its relationship to AEDPA, the Supreme Court explained,

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.  The standards created by Strickland and § 2254(d) are both "highly deferential," id., at 689; Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997), and when the two apply in tandem, review is 'doubly' so, Knowles, 556 U.S., at 123.  The Strickland standard is a general one, so the range of reasonable applications is substantial.  556 U.S., at 123.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington, 562 U.S. at 105.  *See also* Grant v. Lockett, 709 F.3d 224, 232 (3d Cir. 2013) ("A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the Strickland standard itself.  Federal habeas review of ineffective assistance of counsel claims is thus doubly deferential.") (internal citations and quotations omitted).

Under the doubly deferential judicial review that applies to a <u>Strickland</u> claim evaluated under the § 2254(d)(1) standard, there is no basis for this Court to conclude that the Superior Court's adjudication of either of Petitioner's ineffective assistance of counsel claims was an "unreasonable application of" <u>Strickland</u>.  Petitioner has not established that the Superior Court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement[,]" <u>Harrington</u>, 562 U.S. at 103, and, consequently, this claim must be denied.

### 3.  <u>Actual Innocence</u>

In Petitioner's last claim he alleges that he is actually innocent because his confession and consent to search his vehicle were coerced through police misconduct.  Specifically, Petitioner alleges that "[a]fter 4 hours of being shackled to the floor and being interrogated by 6 officers in seriatim, Petitioner's will and resistance was overcome causing Petitioner to parrot whatever they wanted to stop the physical and mental abuse."  (ECF No. 1, p.8.)

To the extent Petitioner is raising a stand-alone actual innocence claim that is separate and apart from his claims challenging the state court's denial of his motion to suppress his statements to police and evidence seized as a result of the search of his vehicle discussed in claim one, or the related claims of ineffective assistance of counsel discussed in claim two, it has not been established that such a freestanding actual innocence claim is cognizable in a habeas corpus proceeding, and, even if it were, Petitioner has failed to submit any evidence whatsoever to lead this Court to question the validity of his conviction.  *See* <u>McQuiggin v. Perkins</u>, 569 U.S. 383, 384 (2013) ("The Court has not resolved whether a prisoner may be entitled to habeas relief based on a freestanding actual-innocence claim[.]") (citing <u>Herrera v. Collins</u>, 506 U.S. 390, 404-05 (1993)); *see also* <u>Reeves v. Fayette SCI</u>, 897 F.3d 154, 160 n.4 (3d Cir. 2018) (explaining

the difference between gateway actual innocence claims and freestanding claims of actual

innocence, which "are assessed under a more demanding standard" to the extent that they are

cognizable).  Accordingly, this claim will be denied.

     **E.**    <u>**Conclusion**</u>

     Based on the aforementioned reasons, the Petition will be denied and a certificate of

appealability will also be denied because jurists of reason would not find it debatable that

Petitioner's claims lacks merit.  *See* 28 U.S.C. § 2253 ("A certificate of appealability may issue .

. . only if the applicant has made a substantial showing of the denial of a constitutional right.");

<u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (Where the district court has rejected a

constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists

would find the district court's assessment of the constitutional claims debatable or wrong.").  A

separate Order will issue.

     Dated: May 21, 2021.

                                             Lisa Pupo Lenihan
                                           United States Magistrate Judge

Cc:    Edward Tyrone Dixon
        JZ-9140
        SCI Benner Twp.
        301 Institution Drive
        Bellefonte, PA  16823

        Counsel of Record
        (*via CM/ECF electronic mail*)

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

EDWARD TYRONE DIXON, )
)    Civil Action No. 18 – 1094
Petitioner, )
)
v. )    Magistrate Judge Lisa Pupo Lenihan
)
ROBERT MARSH, *Superintendent*, )
PA ATTORNEY GENERAL, )
)
Respondents. )

**ORDER**

**AND NOW**, this 21st day of May 2021;

**IT IS HEREBY ORDERED** that, for the reasons set forth in the accompanying Memorandum Opinion, the Petition for Writ of Habeas Corpus (ECF No. 1) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment in favor of Respondents and mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure, Petitioner has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

Lisa Pupo Lenihan
United States Magistrate Judge

Cc:   Edward Tyrone Dixon
JZ-9140
SCI Benner Twp.
301 Institution Drive
Bellefonte, PA  16823

25

Counsel of Record
(*via CM/ECF electronic mail)*